UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

M.P., BY NEXT FRIEND
BRANDI WILLIAMS,

               Plaintiff,                        Case No. 19-13501

vs.                                  HON. MARK A. GOLDSMITH

CITY OF OAK PARK, et al.,

               Defendants.

_____/

## OPINION & ORDER
## (1) GRANTING IN PART AND DENYING IN PART THE OAK PARK DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 61) AND (2) GRANTING THE CVS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 71)

This matter is before the Court on Defendants City of Oak Park and Officers Adam Langford, Matthew Duncan, Adam Hughes, Zachary Tyler, Jason Ginopolis, and Paul Deskiewicz's (collectively, the Oak Park Defendants) motion for summary judgment (Dkt. 61) and on Defendants Woodward Detroit CVS, LLC and Darin Najor's (collectively, the CVS Defendants) motion for summary judgment (Dkt. 71). All motions have been fully briefed. Because oral argument will not assist in the decisional process, the motions may be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons discussed below, the Court grants in part and denies in part the Oak Park Defendants' motion and grants the CVS Defendants' motion.

## I.    BACKGROUND

On March 21, 2018, Najor, a shift supervisor at a CVS store, contacted the Oak Park police department to report a suspected retail theft. See Police Report at 4 (Dkt. 71-1); Najor Dep. I at

15, 70–73 (Dkt. 82-3).   Najor observed Plaintiff M.P., a minor, in one of the store aisles and believed that she was acting in a suspicious manner.  Najor Dep. I at 53–60.  M.P. denies taking any merchandise and explained that, upon entering the store, she walked to an aisle, examined products for five to ten minutes, made an inquiry at the front desk, and left the store.  M.P. Dep. at 14–17 (Dkt. 82-4).  When M.P. left the store, Najor followed her to the parking lot, where M.P. got into the passenger side of a running car and drove away.  Najor Dep. I at 63–65.  Although Najor did not confront M.P. inside the store, he reported a theft to the Oak Park police department and provided the license plate number and a description of the vehicle in which M.P. left.  Id. at 67; Dispatch Audio at 00:05–01:15 (Dkt. 82-2).

Officers were dispatched, and Langford was the first to arrive at the CVS.  Langford Dep. at 17 (Dkt. 82-15).  Najor provided Langford a description of M.P. and stated that he believed he saw her placing merchandise from the cosmetics aisle into her purse.  Police Report at 4.  When Najor and Langford watched the store's surveillance video together, they were unable to see M.P. place any merchandise in her purse or on her person.  Id.; Najor Dep. II at 87 (Dkt. 82-5); Langford Dep. at 26–27.  Langford relayed a description of M.P. to other responding officers and stated that she may have taken merchandise from the cosmetics aisle.  Langford Dep. at 31; Dispatch Audio at 09:26–09:48.

Meanwhile, Ginopolis observed a vehicle matching the description provided by Najor at an intersection near the CVS.  Ginopolis Dep. at 22 (Dkt. 82-9).  Ginopolis and Tyler conducted a traffic stop of the vehicle and identified the driver as Kayla Phillips—who did not match the description of M.P.  Ginopolis Dep. at 24; Police Report at 4–5.  When Phillips heard the officers describe the suspect, she informed them that the description matched her cousin, M.P., whom she

2

had just driven home from the CVS.  Id. at 5.  With Phillips's cooperation, officers followed her to M.P.'s residence.  Id.

Several officers, including Ginopolis, Tyler, and Deskiewicz, approached the front door of the residence.  Ginopolis Dep. at 41–42; Tyler Dep. at 31–32 (Dkt. 61-5); Deskiewicz Dep. at 31 (Dkt. 61-6).[1]  Ginopolis spoke with M.P.'s mother, Brandi Williams, at the front door and explained that the officers were investigating a suspected retail theft in which M.P. may have been involved.  Ginopolis Dep. at 42, 44, 47.  Ginopolis asked if the officers could come into the house, id. at 45, and Williams permitted them inside, Williams Dep. at 17 (Dkt. 82-8); M.P. Dep. at 22 (Dkt. 82-4).  Additionally, Williams consented to officers speaking with M.P., provided that Williams was also present.  Williams Dep. at 15.  On questioning, M.P. admitted to the officers that she had been at the CVS.  M.P. Dep. at 22.  She stated that she left the store without purchasing anything and denied concealing any stolen items in her purse.  Police Report at 5.

The parties dispute precisely what happened next.  The Court first discusses the events as described by the officers and then turns to M.P. and Williams's version of the events.

## A.  Events According to the Officers

According to Ginopolis and Deskiewicz, they requested Williams's permission to search M.P.'s bedroom, which she granted.  Ginopolis Dep. at 48; Deskiewicz Dep. at 37–38.  At that point, the officers believed the merchandise allegedly stolen from the CVS was a pair of false eyelashes.  Ginopolis Dep. at 43–44, 51; Deskiewicz Dep. at 37–38.  Ginopolis and Deskiewicz walked into the bedroom unescorted and performed a visual inspection lasting five to ten seconds.  Ginopolis Dep. at 50–52; Deskiewicz Dep. at 38.  As the officers were preparing to leave the

---

[1] Though Ginopolis, Tyler, and Deskiewicz admit to being present at the house, the parties dispute whether additional officers were present.

house, they were informed by radio that M.P. may have concealed a stolen hairbrush in her purse. Ginopolis Dep. at 59; Deskiewicz Dep. at 39.   Ginopolis advised Williams of the new information and requested to look inside M.P.'s purse.   Ginopolis Dep. at 60; Deskiewicz Dep. at 39–40. Williams agreed.   Ginopolis Dep. at 60; Deskiewicz Dep. at 40.   Accompanied by Deskiewicz, M.P. retrieved her purse from her bedroom and returned to the living room, where one of the officers visually inspected the inside of the purse while M.P. held it open.   Ginopolis Dep. at 60–62; Deskiewicz Dep. at 40–42.   Because no stolen items were found in M.P.'s purse or bedroom, the officers left the home.   Ginopolis Dep. at 62; Deskiewicz Dep. at 42–43.

### B.  Events According to M.P. and Williams

According to Williams, the officers initially asked to search the contents of M.P.'s purse. Williams Dep. at 18.   In the presence of the officers, M.P. voluntarily removed items from her purse one by one, and no stolen items were found.   Id. at 18–19, 25; M.P. Dep. at 28, 33.   The officers then requested permission to search M.P.'s bedroom; Williams consented and escorted one of the officers into M.P.'s bedroom.   Williams Dep. at 19.   The officer shined a flashlight around the bedroom but found nothing and walked out.   Id.   Afterward, a second set of officers arrived at the house, and Williams permitted them into her front room.   Id. at 20–21.

When an officer from the second group asked permission to search M.P.'s purse for a hairbrush, Williams responded that M.P. could empty items from the purse herself but that the officers were not permitted to look through it.   Id. at 25–26.   As M.P. proceeded to empty the contents of her purse for the second time, an officer walked up to her, slapped her hand away, and began to search through the purse himself.   Id. at 26; M.P. Dep. at 28.[2]   Williams became upset and told the officer that he was not permitted to search the purse.   Id.   M.P. confirms that she never

---

[2] M.P. testified that the officers asked to search her purse only one time.   M.P. Dep. at 59–60.

permitted any officer to look through her purse.  M.P. Dep. at 56.  Finally, while Williams was not present inside the house, two officers searched M.P.'s bedroom for a second time, for approximately five to ten minutes.  Id. at 29–30, 56–57; Williams Dep. at 42.  M.P. explained that the officers were not the same individuals who searched her bedroom the first time.  M.P. Dep. at 30.  Both M.P. and Williams denied granting permission for the officers to search the bedroom for a second time.  Id. at 56; Williams Dep. at 42.

M.P., through next friend Williams, brought suit against the Oak Park Defendants and the CVS Defendants as a result of the allegedly unlawful searches of M.P.'s purse and bedroom. Compl. at ¶¶ 26–33 (Dkt. 1).  As to the individually named officers, M.P. asserts a constitutional claim under 42 U.S.C. § 1983, as well as a claim of gross negligence (Counts I and II, respectively). Against Najor, M.P. asserts a claim of negligence (Count III).  M.P. also asserts a negligence claim against CVS, on theories of failure to train or supervise its staff, vicarious liability, and premises liability (Count IV).  Finally, M.P. asserts a Monell claim against the City of Oak Park (Count V). The Oak Pak Defendants and the CVS Defendants have filed separate motions for summary judgment seeking dismissal of the claims advanced against them.

## II.    MOTION STANDARDS

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole

5

could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

### III.    ANALYSIS

#### A.  The Oak Park Defendants' Motion

The Oak Park Defendants seek summary judgment on several grounds. First, they contend that Langford, Duncan, and Hughes are entitled to summary judgment because they had no personal involvement in the allegedly unlawful searches. Oak Park Mot. for Summ. J. (MSJ) at 7–9 (Dkt. 61). Second, they argue that the individual officers are entitled to immunity on the § 1983 and gross negligence claims because M.P. is unable to show that her constitutional rights were violated where she and Williams consented to the searches. Id. at 11, 18. Finally, they argue that Oak Park is entitled to summary judgment on the Monell claim because the constitutional claim against the individual officers fails and because M.P. has failed to adduce evidence showing that Oak Park maintains an illegal policy or custom. Id. at 19. The Court evaluates each of these issues in turn.

#### 1.    Langford, Duncan, and Hughes

Langford, Duncan, and Hughes maintain that they were not personally involved in the allegedly unlawful searches giving rise to M.P.'s claims. "It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must allege some personal involvement by. . . each of the named defendants." Bennett v. Schroeder, 99 F. App'x 707, 712–713 (6th Cir. 2004). Direct participation in a constitutional deprivation, however, is not necessary, as the requisite causation

element is satisfied "'if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"  Green v. Taylor, No. 1:03 CV 1804, 2006 WL 8448445, at *12 (N.D. Ohio Apr. 11, 2006) (quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990)).

Langford argues that he lacked personal involvement in the searches, as he did not go to M.P.'s residence.  Langford Dep. at 36.  Nevertheless, M.P. contends that Langford is liable because he set in motion a chain of events that led to the violation of M.P.'s constitutional rights when he failed to advise the other officers that the surveillance video did not show M.P. taking any merchandise.  Resp. to Oak Park MSJ at 20–21 (Dkt. 74).

Based on his conversation with Najor, Langford reported to dispatch that M.P. was "possibly in custody" of cosmetics in her purse.  Dispatch Audio at 08:55–09:02   And based on his review of the surveillance video, Langford reported to dispatch that M.P. might have had something concealed in her right pants pocket—he did not know what it was and speculated that it could be a piece of paper—but that Najor believed it may have been eyelashes.  Id. at 12:21–12:32.  The audio from Langford's dash-cam does not provide much additional information as to what Langford said to dispatch.  In the dash-cam audio, Langford can be heard commenting, "It's hard to say," but the audio quality is too poor to discern to whom he is speaking or to what he is referring.  Langford Dash-Cam at 13:38–13:50 (Dkt. 74-12).

On these facts, the causal connection between Langford's statements and the unconstitutional search is far too weak.  Langford merely relayed information collected from Najor and the surveillance video to the other officers.  Though he did not advise the other officers that the surveillance video did not capture M.P. stealing any merchandise, he did not definitively state that she stole anything.  A reasonable juror could conclude that Langford's statements foreseeably

led to further investigation.   However, the other officers independently determined, in their discretion, whether a search was lawful and the permissible scope of any search.   It was not reasonably foreseeable that the other officers would conduct searches in an unlawful manner where they allegedly lacked consent to do so.   Thus, it cannot be said that Langford "set in motion" a series of events that he reasonably should have known would result in the violation of M.P.'s constitutional rights.   Langford is, therefore, entitled to summary judgment.

With respect to Duncan, he stated that he was present at the CVS parking lot but never went to M.P.'s residence.   Duncan Dep. at 16–21 (Dkt. 74-8).   M.P. contends that Duncan's activity log reports that he was present at the CVS for 34 minutes.   Id. at 20.   Although surveillance footage captured Duncan walk up to Tyler and then return to his own patrol car, he had no recollection of what he did at the CVS for that duration of time.   Id. at 17–20.   Given Duncan's inability to account for his activities, M.P. contends there is a question of fact regarding his presence at her residence.   To the contrary, such bare speculation is insufficient to satisfy M.P.'s burden of coming forward with specific facts raising a genuine issue for trial.   See Celotex, 477 U.S. at 322–23.   Therefore, Duncan is also entitled to summary judgment.

With respect to Hughes, although he was present at M.P.'s residence at the time of the incident, he stated that he never set foot inside the home.   Hughes Dep. at 28 (Dkt. 74-9). Deskiewicz recalled Hughes, Ginopolis, and himself being at the scene, but confirmed that Hughes never entered the house.   Deskiewicz at 30–32, 44.   M.P. points out that Williams described the officer who conducted the first search of M.P.'s bedroom as a short Caucasian male.   See Williams Dep. at 20.   Because Hughes is Caucasian and 5'7", Hughes Dep. at 10, M.P. suggests that he was the officer who performed the first search of her bedroom, Resp. to Oak Park MSJ at 21.   Again,

8

such speculation is insufficient to raise a genuine issue for trial. Therefore, Hughes is entitled to summary judgment.

### 2. Qualified Immunity

The individual officers maintain that qualified immunity shields them from liability on the § 1983 claim. Under § 1983, civil liability may be imposed against state actors who have deprived a citizen of his or her constitutional rights. Baynes v. Cleland, 799 F.3d 600, 607 (6th Cir. 2015). To succeed on such claim, a plaintiff must demonstrate that "(1) the defendant was a person acting under the color of state law, and (2) the defendant deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." Fridley v. Horrighs, 291 F.3d 867, 871–872 (6th Cir. 2002).

Qualified immunity is a defense against civil suits under § 1983 for government officials performing discretionary duties. "Government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." Jefferson v. Lewis, 594 F.3d 454, 459 (6th Cir. 2010). Once the defense of qualified immunity is raised, it is the plaintiff's burden to prove that the officials are not entitled to qualified immunity. Blosser v. Gilbert, 422 F. App'x 453, 456 (6th Cir. 2011). Courts apply a two-step test in evaluating claims of qualified immunity. As the Sixth Circuit has explained, qualified immunity defeats a § 1983 claim at the summary judgment stage "unless the facts alleged and evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." Jefferson, 594 F.3d at 459–460.

At issue in the present case is whether the individual officers violated the Fourth Amendment when they searched M.P.'s purse and bedroom without a warrant. The individual

officers maintain that they did not violate M.P.'s constitutional rights, as she and Williams consented to the searches.  However, assuming there was a violation, they do not contest whether those rights were clearly established.  And for good reason—the Supreme Court has acknowledged that "'[n]o one would contend that, absent exigent circumstances, the police could intrude upon a home without a warrant' to search for evidence of criminal activity."  Jacob v. Twp. of W. Bloomfield, 531 F.3d 385, 391 (6th Cir. 2008) (quoting United States v. Dunn, 480 U.S. 294, 310 (1987)).

Under the Fourth Amendment, "a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  One such exception is that "[p]olice officers do not need a warrant to search a home when the owner consents to the search," so long as the consent is "'freely and voluntarily given.'"  United States v. Montgomery, 621 F.3d 568, 571 (6th Cir. 2010) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). Generally, "mature family members possess the authority to admit police to look about the family residence," such that teenage children living in a family residence may authorize law enforcement to search the home.  United States v. Clutter, 914 F.2d 775, 777–778 (6th Cir. 1990).  Likewise, police may conduct a warrantless search of personal effects if the owner or someone with joint access grants consent.  United States v. Waller, 426 F.3d 838, 845 (6th Cir. 2005) ("A valid consent to search the closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes.").

When consent serves as the basis for a warrantless search, the permissible scope of the search is limited to the scope of the consent.  United States v. Gant, 112 F.3d 239, 242 (6th Cir.

1997).   Thus, "[t]he standard for measuring the scope of the consent given is objective reasonableness—'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'"  Id. (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). If a previously consenting party retracts his consent, officers must terminate all search efforts immediately.  Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999).  However, to effectively limit or revoke consent, a party must do so explicitly in terms that would be clear to a reasonable officer.  See Jimeno, 500 U.S. at 251.

Viewing the evidence in the light most favorable to M.P., the Court assumes—as indicated by Williams and M.P. during their depositions—that the officers performed two searches of M.P's purse and two searches of her bedroom.  M.P. does not dispute that she voluntarily emptied the contents of her purse during the first search, nor does she dispute that the officers had permission to perform the first search of her bedroom.  Resp. to Oak Park MSJ at 27–28.  Consequently, those searches did not violate the Fourth Amendment.

M.P. maintains that the scope of consent to perform the second search of her purse was expressly limited and that the officers exceeded the scope of that limitation.  Id.  Williams testified that when an officer asked permission to search M.P.'s purse for the second time, she "told [the officer] no, he couldn't go in her purse and look through her stuff, she can pull it out herself, and that's when she proceeded to pull out the items."  Williams Dep. at 25–26.  Despite this express limitation, the officer "got frustrated because what she was pulling out, it wasn't what he was looking for.  So he got frustrated, and that's when he walked up to her and smacked her hand out of the way and start[ed] digging through the purse himself, and that's when I got mad."  Id. at 26.  M.P. likewise testified that an officer began "digging through" her purse without her consent.  M.P.

11

Dep. at 28, 56. Based on this testimony, a reasonable juror could conclude that Williams expressly and clearly limited her consent such that the officers were unauthorized to search M.P.'s purse.

The officers argue that Williams did not revoke permission to search the purse until the officer allegedly slapped M.P.'s hand away and began to search through it himself. Oak Park MSJ at 16–17. They further argue that there is no evidence that officers continued searching the purse after this occurred. Id. at 17. But Williams unequivocally testified that she denied permission to search the purse before the officer allegedly began searching through it himself. Williams Dep. at 21–22, 25–26. At minimum, a genuine issue of material fact exists as to when Williams denied the officers permission to search the purse.

Notwithstanding Williams's denial of consent, the individual officers insist that M.P. consented to the second search through her conduct when she voluntarily began to remove the items from the purse. Oak Park Reply at 4–5 (Dkt. 76) (citing United States v. Little, 431 F. App'x 417, 419 (6th Cir. 2011) ("Even when a defendant initially declines to consent, her subsequent actions, such as opening the trunk of her car, may indicate consent.")). This argument is unavailing, however, where M.P.'s actions were entirely consistent with Williams's express limitation that M.P. could empty the contents of the purse but that the officers were not permitted to do so. Therefore, viewing the evidence in a light favorable to M.P., a reasonable juror could conclude that the officers violated M.P.'s clearly established rights where a reasonable officer would have understood that searching M.P.'s purse exceeded the scope of Williams's consent. The individual officers, therefore, are not entitled to summary judgment on M.P.'s Fourth Amendment claim stemming from the second search of her purse.

M.P. also contends that the officers were unauthorized to perform the second search of her bedroom, as it exceeded the scope of Williams's initial consent. According to Williams, the

officers initially informed her that a manager at CVS had accused a young woman matching M.P.'s description of stealing merchandise from the store.  Williams Dep. at 15.  Ginopolis likewise testified that he explained to Williams the nature of the investigation and asked if he could search M.P.'s bedroom.  Ginopolis Dep. at 47–48.  Williams testified that she gave limited consent permitting the first set of officers to conduct the first search of the bedroom.  Williams Dep. at 19. When a second set of officers arrived at the house, Williams "allowed them in [her] front room," but never gave permission for those officers to search M.P.'s bedroom for a second time.  Id. at 21, 42.  M.P. testified that the officers who performed the second search were not the same individuals who performed the first search.  M.P. Dep. at 30.  Accordingly, M.P. argues, the second search of her bedroom was unlawful because authorization to search it was confined to the officers who performed the first search.  Resp. to Oak Park MSJ at 28–29.

The officers maintain that Williams broadly authorized them to search M.P.'s bedroom and that she never revoked that consent.  Oak Park MSJ at 14–15.  Thus, they claim that the absence of an objection or revocation of consent permitted an inference that the initial consent continued, thereby authorizing them "to execute subsequent, closely-related searches."  Shamaeizadeh v. Cunigan, 338 F.3d 535, 548 (6th Cir. 2003); see also United States v. McMullin, 576 F.3d 810, 815 (8th Cir. 2009) (holding that absent an unequivocal revocation of consent, "police officers may reasonably continue their search in the premises entered pursuant to the initial grant of authority").  However, the Sixth Circuit has limited application of this principle, holding that "regardless of the source of authority for a search, a search ends when subsequent entries into the identified premises are not reasonable continuations of the original search."  Shamaeizadeh, 338 F.3d at 548 n.5.  In Shamaeizadeh, the court determined that where additional officers were called to a residence to perform searches for drugs after the occupant initially consented to a search for a

burglar, the subsequent searches were not reasonable continuations of the initial constitutional search. Id.

It is unclear from the present facts whether Williams expressly limited or revoked her consent authorizing the second set of officers to search the residence. Williams stated that when a second set of officers arrived at the house, she allowed them into her front room but did not authorize them to conduct a second search. Williams Dep. at 21, 42. A reasonable juror could infer from these statements that Williams restricted the officers' access to the front room only— and that they acted outside the scope of her consent when they searched the bedroom for a second time. Additionally, it is unclear from the record whether the second set of officers arrived at the house after the first set completed their searches and departed. Nor does the record reveal how long after the first searches occurred that the second set of officers arrived at the house.

Given the sparse evidence regarding these circumstances, questions of fact preclude the Court from determining whether Williams revoked her consent to further searches of the house when the second set of officers arrived and whether the second search of M.P.'s bedroom may be considered a reasonable continuation of the first search. If Williams revoked her consent or if the second search of the bedroom was not a reasonable continuation of the prior search, a juror could conclude that the officers violated M.P.'s clearly established rights. Consequently, the individual officers are not entitled to summary judgment on the Fourth Amendment claim stemming from the second search of M.P.'s bedroom.

### 3. Gross Negligence

Next, the officers contend that they are entitled to summary judgment on M.P.'s gross negligence claim under the doctrine of governmental immunity. Under Mich. Comp. Laws § 691.1407, employees of a governmental agency are immune from tort liability if (i) they were

14

acting or reasonably believed they were acting within the scope of their official authority; (ii) the governmental agency is engaged in the exercise or discharge of a governmental function; and (iii) their conduct does not amount to gross negligence that is the proximate cause of the injury or damage.  Odom v. Wayne Cnty., 760 N.W.2d 217, 225 (Mich. 2008).  Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a); Maiden v. Rozwood, 597 N.W.2d 817, 824 (1999).

For the reasons discussed above regarding the alleged constitutional violations, a reasonable juror could conclude that the officers were grossly negligent in performing the second searches of M.P.'s purse and bedroom.  Accordingly, the officers are not entitled to summary judgment on the gross negligence claim.

### 4.  **Monell** Liability

Oak Park contends that M.P. is unable to sustain a Monell claim for two reasons: (i) the constitutional claim against the individual officers fails, and (ii) M.P. has failed to adduce evidence showing that Oak Park maintains an unlawful policy or custom.  Oak Park MSJ at 19.  Because the individual officers are not entitled to summary judgment on the § 1983 claim, the Court addresses only the latter argument.

A municipality is not vicariously liable in a § 1983 action merely because it employs someone who has committed a constitutional violation.  See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Instead, to succeed on a municipal liability claim under Monell, a plaintiff must establish that her constitutional rights were violated and that a policy or custom of the municipality was the "moving force" leading to the violation.  Miller v. Sanilac Cnty., 606 F.3d 240, 254–255 (6th Cir. 2010).  An unconstitutional policy or custom may include "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by

15

officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).

In her complaint, M.P. asserts a number of allegedly unconstitutional policies or customs maintained by Oak Park. See Compl. ¶¶ 62(a)–(h). In response to the motion, however, M.P. addresses only Oak Park's alleged failure to train and supervise its officers. Resp. to Oak Park MSJ at 31–32. Thus, the Court confines its analysis to this issue, as allegations regarding any other unconstitutional policy or custom have been abandoned. See Brown v. VHS of Mich., Inc., 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

To succeed on a failure to train or supervise claim, the plaintiff must prove the following: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006). Oak Park challenges M.P.'s ability to satisfy the second element.

"Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989). Deliberate indifference may be established in two ways. The first method requires plaintiffs to "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." Miller, 606 F.3d at 255. M.P. does

16

not identify any prior instances of unconstitutional conduct that would have put Oak Park on notice of a deficiency.

The second method of establishing deliberate indifference applies in a "narrow range of circumstances" where "a plaintiff can show that a municipality was deliberately indifferent by failing to equip law enforcement officers with specific tools to handle recurring situations." Ouza v. City of Dearborn Heights, Mich., 969 F.3d 265, 287 (6th Cir. 2020) (punctuation modified).   As the Supreme Court has explained, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 390. Under this approach, a plaintiff need not show that the municipality had notice of a pattern of unconstitutional conduct. Ouza, 969 F.3d at 287.   Rather, "a plaintiff can show deliberate indifference based on 'single-incident liability' if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it." Id.  Here, M.P. contends that the existing training is clearly deficient on its face. Resp. to Oak Park MSJ at 32.

According to Langford, he received training regarding arrests and probable cause in police academy and during a three- to six-month-long field training upon his initial hire with Oak Park. Langford Dep. at 9–10.  Since then, he has participated in formal training classes but could not specifically recall the subject matter of those classes. Id. at 10.  Additionally, he receives periodic updates from the Michigan State Police. Id. at 9.  Hughes's, Tyler's, Deskiewicz's, and Duncan's descriptions of their training regarding arrests, probable cause, and reasonable suspicion were similar. See Hughes Dep. at 9–10; Tyler Dep. at 12; Deskiewicz Dep. at 8–9; Duncan Dep. at 9–

17

11.   Ginopolis added that Oak Park provides frequent and ongoing training in the form of classroom sessions and periodic emails and memoranda.  Ginopolis Dep. at 7–8.

In support of her position that this training was obviously deficient, M.P. notes Langford's, Duncan's, and Tyler's testimony that they did not specifically recall whether the periodic updates or training sessions addressed probable cause, reasonable suspicion, or arrests.  See Langford Dep. at 9; Duncan Dep. at 11; Tyler Dep. at 12–13.  Similarly, she observes that Hughes and Deskiewicz were uncertain whether Oak Park maintained policies or procedures regarding drafting police reports, reasonable suspicion, probable cause, or requiring periodic review of department policies. Hughes Dep. at 8, 15–16; Deskiewicz Dep. at 9–10, 13–14.  But these officers' inability to recall the specifics of training materials or department policies does not demonstrate that no training on these subjects occurred.[3]

The evidence demonstrates that the officers received some training regarding arrests and probable cause determinations.[4]   Thus, the facts here are unlike those in Ouza, where the municipality failed to provide any training whatsoever regarding frequently employed principles such as probable cause determinations and the use of force.  See 969 F.3d at 289.  Where officers have been afforded some training, the Sixth Circuit has held that a plaintiff must show that the municipality, "through its policymaker(s), was on notice that, absent additional training, it was so highly predictable" that law enforcement would engage in unconstitutional conduct "as to amount to conscious disregard for citizens' rights."  Harvey v. Campbell Cnty., Tenn., 453 F. App'x 557,

---

[3]   M.P. also emphasizes that Hughes declined to render opinions regarding his general understanding of the permissible scope of searches where an owner has given consent.  Hughes Dep. at 34–36.  However, Hughes's willingness to render opinions regarding hypothetical questions has no bearing on the adequacy of his training.

[4] Though the scope of consent to perform a search would presumably be more relevant to the constitutional violations alleged here, the officers were questioned during their depositions about their training in arrests, probable cause, and reasonable suspicion.

568 (6th Cir. 2011); see also Ferchak v. City of Burton, No. 19-12141, 2021 WL778910, at *10 (E.D. Mich. Feb. 28, 2021). M.P. has not met that burden. Because M.P. has failed to demonstrate that the officers' training was grossly inadequate, M.P. is unable to raise a genuine issue of material fact regarding her claim that Oak Park failed to train its officers. Accordingly, Oak Park is entitled to summary judgment on M.P.'s Monell claim.

### B. The CVS Defendants' Motion

M.P. asserts negligence claims against the CVS Defendants. She alleges that Najor negligently performed his duties by making false statements to police when he reported the suspected shoplifting, while she asserts that CVS is liable on theories of failure to train and supervise its staff, vicarious liability, and premises liability. In their response and in supplemental briefing, the CVS Defendants argue that they are entitled to summary judgment for several reasons, including a lack of causation. CVS MSJ at 8–9. (Dkt. 71); CVS Suppl. Br. at 2–3 (Dkt. 90).

The Court first evaluates whether M.P. can establish causation with respect to the negligence claim against Najor and the failure to train claim against CVS. Concluding that she is unable to do so, the Court next determines that CVS cannot be held vicariously liable where Najor is not liable for negligence. Finally, the Court finds that M.P. is unable to sustain a premises liability claim, as her complaint sounds exclusively in ordinary negligence.

### 1.   Najor's Negligence and CVS's Failure to Train

As indicated above, M.P. asserts that the CVS Defendants are directly liable for negligence based on Najor's false report of shoplifting and on CVS's failure to adequately train its staff regarding retail theft protocols. "A claim of ordinary negligence is based on the underlying premise that a person has a duty to conform his or her conduct to an applicable standard of care when undertaking an activity." Jeffrey-Moise v. Williamsburg Towne Houses Cooperative, Inc.,

No. 351813, – N.W.2d –, 2021 WL 650475, at *3 (Mich. Ct. App. Feb. 18, 2021). To establish a prima facie case of negligence, a plaintiff must prove four elements: "(1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of those damages." Id.

With respect to the causation element, Michigan courts have defined "proximate cause" as a cause "'which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred . . . .'" Auto Owners Ins. Co. v. Seils, 871 N.W.2d 530, 545 (Mich. Ct. App. 2015) (quoting McMillian v. Vliet, 374 N.W.2d 679, 681 (Mich. 1985)). Incorporated in this definition is the express acknowledgement that "the chain of causation between the defendant's conduct and the plaintiff's injuries may be broken by an intervening or a superseding cause[,]" i.e., an event that "'actively operates in producing harm to another after the actor's negligent act or omission has been committed.'" Id. (quoting McMillian, 374 N.W.2d at 682).

Where an intervening cause breaks the chain of causation, the original actor is relieved of liability unless the intervening act was reasonably foreseeable. McMillian, 374 N.W.2d at 682. The Sixth Circuit has summarized Michigan precedent regarding intervening cause as follows:

> If an intervening force is not reasonably foreseeable under an objective standard, it constitutes a "superseding cause" which relieves a prior negligent defendant from liability. "While an act of God or the gross negligence or intentional misconduct by the victim or a third party will generally be considered a superseding cause, ordinary negligence by the victim or a third party will not be regarded as a superseding cause because ordinary negligence is reasonably foreseeable." An intervening cause is considered reasonably foreseeable when the defendant's negligence "enhanc[es] the likelihood that the intervening cause will occur." "[W]hether an intervening negligent act of a third person constitutes a superseding proximate cause is a question for the jury."

Rupert v. Dagget, 695 F.3d 417, 426 (6th Cir. 2012) (citations omitted, emphasis in original). Whether an act by a third party is an intervening cause is determined by reference to several factors,

20

including: (i) "the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation"; (ii) "the fact that the operation of the intervening force is due to a third person's act or his failure to act"; and (iii) "the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him[.]" Patterson v. Cabala, No. 260728, 2006 WL 2271319, at *3–4 (Mich. Ct. App. Aug. 8, 2006) (quoting 2 Restatement Torts, 2d, § 442) (punctuation modified).

Even assuming Najor's and CVS's negligence, the CVS Defendants argue that the individual officers' conduct in performing the searches was the intervening cause of M.P.'s alleged injuries. CVS Suppl. Br. at 2–3. They contend that the officers' allegedly unconstitutional actions were not the foreseeable result of Najor's allegedly false statements made when he called the police to report a retail theft. Id. Further, they emphasize that the officers' alleged conduct was an unforeseeable intervening cause because it amounted to gross negligence or intentional misconduct, as opposed to ordinary negligence. Id. at 4–5.

The Court agrees that the officers' alleged conduct was the intervening cause of M.P.'s injuries, thereby relieving the CVS Defendants of liability. Even assuming that Najor made a false report of shoplifting and that CVS failed adequately to train staff regarding retail thefts, the officers directly and independently caused the alleged harm by unlawfully searching M.P.'s purse and bedroom. Without further input from Najor, the officers applied their discretion in determining whether the searches were permissible and appropriate exercises of their authority. It would not have been reasonably foreseeable to the CVS Defendants that the officers would persist in conducting unconstitutional searches of M.P.'s purse and bedroom after M.P. and Williams allegedly withdrew their consent to do so. Moreover, the officers' allegedly wrongful acts

21

independently subject them to liability to M.P., as discussed above.  Other courts have likewise

held that alleged misconduct by law enforcement supersedes civilian reports of suspected criminal

activity or other exigent circumstances as the proximate cause of any constitutional violations.[5]

Additionally, as argued by the CVS Defendants, this conclusion is bolstered by the fact

that if the officers committed the alleged constitutional violations, these violations would amount

to gross negligence or intentional misconduct.  See Johnson v. Moseley, 790 F.3d 649, 653 (6th

Cir. 2015) ("Qualified immunity gives ample room for mistaken judgments by protecting all but

the plainly incompetent or those who knowingly violate the law.") (punctuation modified); Ahlers

v. Schebil, 188 F.3d 365, 373 (6th Cir. 1999) (holding that to succeed on a § 1983 claim, a plaintiff

"must establish that the defendant acted knowingly or intentionally to violate his or her

constitutional rights, such that mere negligence or recklessness is insufficient" ).  As indicated

above, gross negligence and intentional misconduct are considered unforeseeable.  Rupert, 695

F.3d at 426 (citing People v. Schaefer, 703 N.W.2d 774, 786 (Mich. 2005); Love v. City of Detroit,

716 N.W.2d 604, 610 (Mich. Ct. App. 2006) (Cooper, J., dissenting)).

In support of her argument that the officers' alleged conduct was not an intervening cause,

M.P. cites Davis v. Thornton, 180 N.W.2d 11 (Mich. 1970), a case involving a defendant who left

---

[5] See, e.g., Chapman v. Wal-Mart Stores East, LP, No. 2:17cv283, 2018 WL 2144489, at *6 (E.D. Va. May 9, 2018) (dismissing a negligence claim based on a store's 911 call reporting a suspected shoplifting where an officer's shooting of the decedent was the intervening cause of the decedent's death); Earle v. City of Huntington, No. 3:14-29536, 2017 WL 2960542, at *6 (S.D.W.Va. July 11, 2017) (holding that a police officer's actions in subduing a patient with a mental disorder superseded the hospital staff's 911 call reporting that the patient had left the hospital against medical advice as the proximate cause of the patient's death); A.B. by Ybarra v. City of Woodland Park, No. 14-cv-00151, 2016 WL 1237195, at *5 (D. Colo. Mar. 29, 2016) (holding that an officer's actions in shooting the decedent, and not a store's negligent misidentification of the decedent as a shoplifter, was the proximate cause of the decedent's injuries); Brown v. Hill, 174 F. Supp. 3d 66, 75 (D.D.C. 2016) (holding that responding officers' actions in involuntarily committing the plaintiff superseded the nonprofit-managed residence's call to a crisis assistance helpline as the proximate cause of the plaintiff's alleged constitutional violations).

an unlocked car parked on the street, with the keys in the ignition and the motor running.  Id. at 13.  A group of minors took the car for a joyride, crossed the centerline of a highway, and collided with the plaintiff's car, killing one occupant and severely injuring others.  Id.  The court rejected the argument that that the minors' negligent operation of the car was an intervening cause of these injuries, as it was a foreseeable consequence of the defendant leaving the car unlocked with the keys in the ignition.  Id. at 16–17.  Davis, however, is distinguishable from the present case, as it involved negligent conduct of third persons and did not address the foreseeability of grossly negligent or intentional misconduct.  See id.  As noted above, other cases have held that the ordinary negligence of a third party is reasonably foreseeable, whereas grossly negligent or intentional acts are not.  See Rupert, 695 F.3d at 426.

Next, M.P. disputes whether the officers' allegedly unconstitutional searches amount to grossly negligent or intentional conduct, arguing that subjective intent is irrelevant to establishing a § 1983 claim or to evaluating whether officers acted objectively reasonably under the Fourth Amendment.  M.P. Suppl. Br. at 11–12 (Dkt. 91).  M.P.'s argument misses the mark.  To be sure, a plaintiff need not prove specific intent to maintain an action under § 1983.  Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled on other grounds by Monell, 436 U.S. 658.  But it is also true that ordinary negligence is insufficient to sustain a § 1983 claim; the conduct giving rise to such a claim must rise to the level of gross negligence or intentional violation of a plaintiff's constitutional rights.  See Johnson, 790 F.3d at 653; Ahlers, 188 F.3d at 373.

Because the Court concludes that the officers' conduct constituted an unforeseeable intervening cause resulting in M.P.'s alleged injuries, Najor is entitled to summary judgment on the negligence claim, while CVS is entitled to summary judgment on the failure to train claim.

23

### 2.      Vicarious Liability

The Court briefly addresses the vicarious liability claim asserted against CVS.   As concluded above, M.P. is unable to sustain a negligence claim against Najor.   Because a principal cannot be held vicariously liable in the absence of an agent's or employee's liability, CVS is entitled to summary judgment on M.P.'s negligence claim under that theory.   See Lincoln v. Gupta, 370 N.W.2d 312, 316 (Mich. Ct. App. 1985) ("A principal . . . cannot be held liable if the agent having primary responsibility is not liable.").

### 3.      Premises Liability

Although M.P. asserts a premises liability claim against CVS in addition to an ordinary negligence claim, "[c]ourts are not bound by the labels that parties attach to their claims." Buhalis v. Trinity Continuing Care Servs., 822 N.W.2d 254, 258 (Mich. Ct. App. 2012).   Instead, courts must determine the nature of an action "by reading the complaint as a whole, and by looking beyond mere procedural labels . . . ." Adams v. Adams, 742 N.W.2d 399, 403 (Mich. Ct. App. 2007).   "Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land." Buhalis, 822 N.W.2d at 258 (citing James v. Alberts, 626 N.W.2d 158, 161–62 (Mich. 2001)).   "If the plaintiff's injury arose from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence[.]" Id. (emphasis added); see also Piech v. Layendecker, 194 A.3d 543, 547–549 (N.J. Super. Ct. App. Div. 2018) (holding that "the term 'dangerous condition' refers to physical conditions of the property itself and not to activities conducted on the property") (punctuation modified).

Here, M.P.'s negligence claim stems from Najor's conduct rather than any physical condition on CVS's premises.   Consequently, the claim sounds in ordinary negligence rather than premises liability, and CVS is entitled to summary judgment on the premises liability claim.

## IV.    CONCLUSION

For the reasons stated above, the Court grants in part and denies in part the Oak Park Defendants' motion for summary judgment (Dkt. 61) and grants the CVS Defendants' motion for summary judgment (Dkt. 71).  Based on these rulings, Oak Park, Langford, Duncan, Hughes, Najor, and CVS are dismissed from the action.

SO ORDERED.

Dated:  August 12, 2021                           s/Mark A. Goldsmith
     Detroit, Michigan                         MARK A. GOLDSMITH
                                                 United States District Judge